**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| **SURYA HOTEL LLC (f/k/a SHIV KRUPA MOTEL, INC.), a Kentucky limited liability company,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**HOLIDAY HOSPITALITY FRANCHISING, LLC, a Delaware limited liability company, and SIX CONTINENTS HOTELS, INC., d/b/a InterContinental Hotels Group, a Delaware corporation,**<br><br>**Defendants.** | **Civil Action File No.** |

## COMPLAINT

Plaintiff Surya Hotel LLC (f/k/a Shiv Krupa Motel, Inc.) ("Plaintiff" or "Surya"), by and through undersigned counsel, files this Complaint against Defendants Holiday Hospitality Franchising, LLC ("HHF") and Six Continents Hotels, Inc., d/b/a InterContinental Hotels Group ("IHG") (collectively, "Defendants"), and alleges as follows:

## PRELIMINARY STATEMENT

1. This is an action for breach of contract and breach of the implied covenant of good faith and fair dealing arising from a franchise relationship between Plaintiff, a hotel franchisee, and Defendants, the franchisor and its corporate parent.

2. Plaintiff owns and operates a Holiday Inn hotel located at 101 West Muhammad Ali Boulevard, Louisville, Kentucky 40202 (the "Hotel") pursuant to a License Agreement with Defendant HHF executed in early 2018, with the Hotel opening in 2021.

3. Throughout the franchise relationship, Defendants engaged in breaches of the License Agreement that caused direct and demonstrable harm to Plaintiff, including: (a) failing to execute timely blackout requests for Kentucky Derby dates, which resulted in reservations being taken at extremely low non-event rates that Defendants then required Plaintiff to honor, while continuing to refuse Plaintiff access to the reservation service for the Hotel through the weekend of the 2020 Kentucky Derby; (b) approving horizontal cable railings during multiple design reviews and site visits, then demanding costly retrofits after construction was complete; (c) mandating purchases through approved vendors at elevated prices while simultaneously penalizing Plaintiff during QA inspections for deficiencies in those same vendor-supplied items; and (d) failing to provide adequate digital marketing, search engine optimization, reputation management, and pre-opening support, materially impairing the Hotel’s ability to generate awareness, drive demand, and compete effectively within its market.

4. Pursuant to the License Agreement, this action is governed by Georgia law, the parties have waived their right to a jury trial, and the parties have broadly

waived punitive, exemplary, incidental, indirect, special, consequential, and similar damages.

## PARTIES AND JURISDICTION

5. Plaintiff Surya Hotel LLC (formerly known as Shiv Krupa Motel, Inc.) is a Kentucky limited liability company with its principal place of business at 2103 Club Vista Place, Louisville, Kentucky 40245.

6. Plaintiff is the current holder of the franchise agreement with Defendants for the operation of the Holiday Inn Louisville Downtown hotel.

7. Defendant Holiday Hospitality Franchising, LLC is a Delaware limited liability company with its principal place of business located at Three Ravinia Drive, Suite 100, Atlanta, Georgia 30346.

8. Defendant HHF is the franchisor entity that markets, offers, and sells Holiday Inn Brand franchises, including Holiday Inn, Holiday Inn Express, and Holiday Inn Resort, and enters into standardized franchise agreements (referred to as "License Agreements") with its franchisees.

9. Defendant Six Continents Hotels, Inc., doing business as InterContinental Hotels Group ("IHG"), is a Delaware-registered corporation with its principal place of business located at Three Ravinia Drive, Suite 100, Atlanta, Georgia 30346.

10. Defendant IHG owns Defendant HHF and acts through HHF as its franchising affiliate. By virtue of its ownership of HHF and control over the franchise system, IHG is an intended third-party beneficiary of the License Agreements.

11. Defendants may be collectively referred to herein as "IHG" or "Defendants."

12. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

13. For purposes of diversity jurisdiction under 28 U.S.C. § 1332, the citizenship of a limited liability company is determined by the citizenship of each of its members. If a member of an LLC is itself an LLC, the inquiry must continue through each layer of membership until individuals or corporations are reached.

14. Plaintiff Surya Hotel LLC has two members: Nimish Patel and Girish Patel. Nimish Patel and Girish Patel are the sole members of Surya Hotel LLC, and no other person or entity holds any membership interest in Plaintiff.

15. Nimish Patel is a natural person who is domiciled at 2103 Club Vista Place, Louisville, Kentucky 40245. Nimish Patel is therefore a citizen of the Commonwealth of Kentucky for purposes of diversity jurisdiction.

16. Girish Patel is a natural person who is domiciled at 2103 Club Vista Place, Louisville, Kentucky 40245. Girish Patel is therefore a citizen of the Commonwealth of Kentucky for purposes of diversity jurisdiction.

17. Because Plaintiff's sole members—Nimish Patel and Girish Patel—are both citizens of Kentucky, Plaintiff Surya Hotel LLC is a citizen of Kentucky for purposes of diversity jurisdiction.

18. Defendant Holiday Hospitality Franchising, LLC is a Delaware limited liability company. Upon information and belief, Defendant IHG is the sole member of Defendant HHF. Because Defendant IHG is a corporation incorporated in Delaware with its principal place of business in Georgia, Defendant HHF is a citizen of both Delaware and Georgia for purposes of diversity jurisdiction.

19. Defendant Six Continents Hotels, Inc. is a corporation incorporated under the laws of Delaware with its principal place of business in Georgia, and is therefore a citizen of Delaware and Georgia.

20. Accordingly, there is complete diversity of citizenship between Plaintiff, a citizen of Kentucky, and Defendants, who are citizens of Delaware and Georgia. No party shares citizenship with any other party.

21. Venue is proper in this judicial district pursuant to the parties' License Agreement, which provides that any litigation relating to the License Agreement

shall be brought in "the U.S. District Court for the Northern District of Georgia (Atlanta Division) or the State/Superior Courts of DeKalb County."

22. Alternatively, venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because Defendants regularly transact business within the geographic boundaries of this District, Defendants reside in this District, and a substantial part of the events giving rise to the claims occurred in this District.

23. The License Agreement is governed by Georgia law, and all disputes between the parties, whether sounding in contract, tort, or otherwise, are governed and construed under the laws and decisions of the State of Georgia.

## FACTUAL BACKGROUND

### A. The License Agreement

17. On or about early 2018, Plaintiff and Defendant HHF entered into a Holiday Inn Hotel Conversion License Agreement (the "License Agreement") for the operation of a Holiday Inn hotel at 101 West Muhammad Ali Boulevard, Louisville, Kentucky 40202.

18. Pursuant to the License Agreement, Defendant HHF granted Plaintiff in Section 2 of the License Agreement a non-exclusive license to use Defendants' System (as defined in the License Agreement) only at the Hotel and in accordance with the License Agreement. Section 1.B of the License Agreement specifies that the System includes, but is not limited to, "access to a reservation service operated

in accordance with specifications established by Licensor from time to time," and under Section 3.A(9), that Licensee was required to "participate in and use those reservation services which Licensor deems to be in the best interests of the System," and under Section 3.B(1)(b), pay a Services Contribution to be used for reservations, among other related services. Under Section 3.B(1)(d), Licensee was also obligated to pay fees in connection with the "new hotel opening" and other related services.

19. The Hotel comprises a 5-story, interior corridor building with 91 approved guest rooms, a rooftop terrace, fitness center, and approximately 1,000 square feet of meeting space.

20. Pursuant to Section 4.B of the License Agreement, Licensor agreed to "afford Licensee access to reservation service for the Hotel on terms consistent with this License" during the License Term, so long as Licensee is in full compliance with its obligations.

21. Pursuant to Section 3.A of the License Agreement, Licensee is required to "participate in and use those reservation services which Licensor deems to be in the best interests of the System."

22. Pursuant to Section 3.A of the License Agreement, Licensee is required to "strictly comply with all of Licensor's standards and specifications for goods and services used in the operation of the Hotel."

23. The License Agreement provides that Licensor's reservation and support obligations are framed as "system-level" functions exercised in Licensor's "sole business judgment." Notwithstanding this discretion, Defendants' express acknowledgment of Plaintiff's timely blackout request, followed by failure to execute and subsequent directive requiring Plaintiff to honor low-rate reservations, and continued refusal to provide access to the reservation service for the Hotel at least through the weekend of the 2020 Kentucky Derby to correct confirmed erroneous bookings, constitutes an affirmative directive that caused direct, out-of-pocket harm.

24. The License Agreement authorizes Licensor to designate approved suppliers and enforce standards. However, Defendants' pattern of mandating purchases through approved vendors at elevated prices while simultaneously penalizing Plaintiff during QA inspections for deficiencies in those vendor-supplied items demonstrates bad-faith enforcement that violates express standards as applied.

25. Further, Defendants' repeated refusal to provide new hotel opening services in connection with digital marketing, search engine optimization, reputation management, and pre-opening support, materially impaired the Hotel's ability to generate awareness, drive demand, and compete effectively within its market, favoring other IHG-branded hotels to the detriment of Licensee, while charging Licensee for such purported services.

**B. The Kentucky Derby Reservations Failure**

26. The Kentucky Derby is the highest compression event in Louisville, representing a critical revenue opportunity for hotels in the Louisville market.

27. In March 2020, due to the COVID-19 pandemic, the Kentucky Derby was rescheduled from its traditional May date to September 5, 2020.

28. On March 16, 2020, prior to the Hotel's opening and prior to any rate loading, Plaintiff's representative Nimish Patel expressly instructed Defendants' pre-opening team, including Gay Lynn Morrison (Regional Director, Revenue Management, New Hotel Openings), to block the rescheduled Kentucky Derby dates of September 3-5, 2020.

29. Plaintiff's request specifically stated: "Ky Derby will be changed to September 5, 2020 so let's black out September 3-5, 2020 for now."

30. On March 17, 2020, Gay Lynn Morrison forwarded Plaintiff's request to Defendants' Pre-Sell Program team with the instruction: "Team - please zero out these dates until I can talk to the hotel tomorrow."

31. Despite Plaintiff's timely request and Defendants' internal acknowledgment, Defendants failed to execute the block request in a timely manner.

32. As a result of Defendants' delay in implementing Plaintiff's blackout request, Defendants' reservation system allowed public reservations to be made at

extremely low, non-Derby event pricing—rates as low as approximately $132 per night when Derby rates in Louisville typically exceed $700-$999 per night.

33. A massive number of reservations were made at these incorrect low rates before Defendants finally blocked the dates.

34. When Plaintiff attempted to address the situation by contacting guests and offering them a discounted rate of 25% off the correct selling rate of $999 per night (making the rate $749 per night), most guests refused and demanded to keep their original reservations at the incorrect low rates.

35. Some guests, including at least one attorney, threatened legal action against Plaintiff if their original reservations were not honored at the incorrect low rates.

36. When Plaintiff escalated this matter to Defendants, including through Gay Lynn Morrison, Michael Conner, and Cory Floyd, Defendants confirmed in writing that Plaintiff was still required to honor all low-rate Derby bookings despite Defendants' admitted error.

37. On April 14, 2020, Gay Lynn Morrison confirmed in writing: "If you presented the guest with options, and they declined to accept to your rate increase, or declined to cancel, then those reservations will need to remain in the system."

38. When Plaintiff asked directly, "So we have keep and honor the reservations with the low rates when I asked to block those days??", Defendants' Gay Lynn Morrison responded: "Yes."

39. Defendants provided no remediation, corporate messaging, compensation support, override authority, or public relations protection to Plaintiff. This continued through the weekend of the 2020 Kentucky Derby that took place on September 5, 2020. Defendants continued to prohibit access to the reservation service for the Hotel to rectify or remediate the low rates at least through the weekend of the 2020 Kentucky Derby.

40. Defendants' IHG walk policy provides that when guests accept relocation to other properties, "1 night room, transportation cost, or any compensation issued will be invoiced to your hotel."

41. Defendants' failure to timely execute Plaintiff's blackout request, followed by Defendants' affirmative directive requiring Plaintiff to honor low-rate reservations, and Defendants’ refusal to provide access to the reservation service for the Hotel, caused Plaintiff to suffer direct, out-of-pocket damages including:

a. Relocation/walk charges invoiced to Plaintiff under Defendants' walk policy when guests were relocated to other properties;

b. Refunds and chargebacks actually paid to guests who disputed their reservations;

c. Goodwill credits actually paid to impacted guests; and

d. Incremental dispute-handling costs, including labor and overtime directly attributable to the Derby booking episode.

42. Such breaches started in March 2020 and continued through the weekend of the 2020 Kentucky Derby. Defendants' breaches occurred during the Hotel's opening phase and caused Plaintiff to suffer reputational harm and operational damages.

43. As a result of Defendants' actions, Plaintiff was forced to open the Hotel under extremely difficult circumstances, including but not limited to, dealing with angry guests, resolving guest disputes, mitigating negative guest experiences, and receiving unjustified negative reviews that impacted the Hotel's reputation and goodwill early on in its operation.

44. Despite causing these harms by failing to timely execute Plaintiff's blackout request, Defendants further failed to provide any meaningful mitigation support, operational assistance, guest communication strategy, or other remediation efforts to Plaintiff thereafter. Plaintiff was left to independently manage and absorb the fallout from Defendants' breaches.

**C. The Post-Approval Railing Retrofit**

45. Prior to construction of the Hotel, Plaintiff submitted architectural plans to Defendants for review and approval, as required by the License Agreement.

46. Plaintiff's plans included horizontal cable railings for the Hotel's stairways, which were IBC code compliant and extended only up to the second level.

47. Defendants reviewed Plaintiff's architectural plans two or three times during the design phase and conducted site visits during construction.

48. At no point during design review or construction did Defendants raise any objection to the horizontal cable railing system.

49. Plaintiff's architect, Benjamin Van Eps, AIA of BRP Architects, confirmed in writing that "this project has been reviewed 2 or 3 times by IHG during design and they have visited the site a few times during construction – This concern was not mentioned prior to now, at least not to the design team."

50. Plaintiff reasonably relied on Defendants' multiple approvals of the drawings and proceeded to install the horizontal cable railing system as designed and approved.

51. After construction was complete—approximately two years after the design was finalized and very clearly shown in the drawings—Defendants demanded that Plaintiff remove or retrofit the horizontal cable railings, citing them as a "climbing hazard."

52. On August 28, 2020, Tony Rawe, Director of Construction Services for IHG, stated: "I noticed the horizontal cable railing in the photos. As noted in my

previous email and report, horizontal rails are not permitted by IHG as they create a climbing hazard."

53. On September 15, 2020, Mitch Goldberg, Regional Director, Franchise Openings & Renovations for IHG, similarly stated: "horizontal rails are not permitted by IHG as they create a climbing hazard. One option previously noted was the installation of clear acrylic panels attached to the rail, keeping the existing cable, but preventing the ability to climb it while maintaining the existing look."

54. Plaintiff's architect stated that hearing about this concern "two years after design was wrapped-up and very clear in the drawings is disappointing" and noted that "[t]here have been plenty of times this could have been flagged prior to the completion of construction."

55. Plaintiff's architect further noted that "design modifications at this point are not very feasible or sightly" and requested a variance since the horizontal cables were IBC code compliant.

56. Defendants required Plaintiff to retrofit the railing system despite having multiple opportunities to flag the design issue during the approval process and despite the fact that the required retrofit was financially and structurally invasive.

57. The retrofit cost Plaintiff approximately $10,000 in additional expenditures.

58. Plaintiff acknowledges that the License Agreement's plan-review disclaimer provides that plan review is "exclusively for determination of compliance with the Standards" and disclaims liability for adequacy, suitability, or compliance with law. However, Plaintiff seeks declaratory relief and, alternatively, damages for breach of the implied covenant of good faith and fair dealing based on Defendants' inequitable enforcement of standards after repeated approvals and reliance.

**D. Forced Vendor Procurement Coupled with QA Penalties**

59. Defendants mandated that Plaintiff purchase linen, terry, soft goods, and amenities exclusively through Defendants' approved vendors at elevated pricing, despite identical or superior quality being available at lower cost from other sources.

60. After forcing Plaintiff to purchase specific items through Defendants' approved vendors, Defendants then failed the same items during QA inspections and issued thousands of dollars in penalties against Plaintiff.

61. Between 2021 and 2025, Defendants assessed QA-related penalties and fees against Plaintiff totaling approximately $43,171.71 in unnecessary charges, including:

a. Quality Compliance Fees of $2,500 assessed in March 2025 and October 2025;

b. Guest Love Compliance Fees of $4,500 (April 2025), $7,500 (July 2025), and $7,500 (October 2025);

c. Member Recognition Fees of $1,000 (December 2025) and $2,000 (October 2023); and

d. Guest Relations Fees assessed monthly throughout 2025.

62. Defendants allowed no leniency, variance, or timeline adjustment despite supply chain limitations and Defendants' own vendor restrictions.

63. Defendants' conduct in mandating purchases through approved vendors at elevated prices while simultaneously penalizing franchisees for deficiencies in those vendor-supplied items mirrors claims alleged in the 110 Sunport LLC class action complaint (Case No. 1:21-cv-00844, D.N.M.) against IHG involving anticompetitive vendor arrangements. That complaint alleged that "[t]he rates for goods and services through the closed vendor system which franchisees of [IHG]/HHF are required to use are higher than market rates for the same goods and/or services and, as a result of use by its franchisees, IHG/HHF receives financial kickbacks from the vendors in its closed system."

64. The 110 Sunport LLC complaint further alleged that "most furniture items that IHG/HHF require its franchisees... to purchase from required vendors are of such inferior quality that they break, disassemble and/or damage upon initial delivery and/or assembly and are rendered unusable or they have a limited use life and generally are substandard."

### E. Failure to Provide Adequate Marketing, SEO, and Pre-Opening Support

65. From the Hotel's opening in May 2021, Plaintiff repeatedly raised concerns with Defendants regarding the Hotel's poor online visibility, weak search engine rankings, limited digital presence, and overall market positioning.

66. Despite numerous requests, calls, emails, and discussions with Defendants' representatives, meaningful digital marketing and SEO support was either delayed, inconsistent, or never provided.

67. One specific issue that Plaintiff repeatedly raised with Defendants' digital marketing and IT teams involved the branding and online positioning of the "Candlewood Suites Louisville—NE Downtown Area by IHG." Despite being located miles from Louisville's downtown core, that property was marketed and promoted using the term "Downtown Area," while the actual Holiday Inn Louisville Downtown—located in the heart of downtown Louisville adjacent to the Kentucky International Convention Center, KFC Yum! Center, and other major demand generators—struggled with online visibility and search positioning.

68. Plaintiff repeatedly questioned how a non-downtown property could be permitted to utilize "Downtown Area" branding while the actual downtown Holiday Inn struggled with online visibility and search positioning. Despite these concerns being raised on multiple occasions, Defendants failed to provide a meaningful explanation or corrective action.

69. At a minimum, Defendants' permitting of the "Downtown Area" branding for a non-downtown property created marketplace confusion and diluted the online visibility of the Holiday Inn Louisville Downtown for highly valuable downtown-related search terms.

70. As reflected in contemporaneous correspondence and internal reports, Plaintiff was ultimately forced to engage third-party management and consulting resources to perform functions that should have been supported through Defendants' brand infrastructure, including search engine optimization, digital marketing, online reputation management, and revenue strategy.

71. Internal reports demonstrate that basic SEO initiatives and keyword rankings for search terms such as "Downtown Louisville Hotels" and "Hotel Near KFC Yum! Center" were only achieved after significant outside intervention and expenditure by Plaintiff. For a full-service branded hotel located in the heart of downtown Louisville, these are fundamental marketing objectives that should have been established and supported by Defendants from the outset.

72. As recently as April 2025—nearly four years after the Hotel's opening—Defendants' personnel were still discussing the initiation and ramp-up of SEO services for the Hotel, with Defendants' representative stating that it typically takes between 3–6 months for new content to be indexed by major search engines.

SEO services that should have been implemented at or shortly after the Hotel's opening were still in early stages years later.

73. Throughout this period, Defendants continued collecting royalty fees, marketing fees, technology fees, reservation fees, and other franchise fees from Plaintiff while failing to provide the level of digital marketing, SEO, and brand support necessary to properly launch, position, and promote the Hotel.

74. Defendants' failures in providing adequate digital marketing, SEO, and pre-opening support materially impaired the Hotel's ability to generate awareness, drive demand, compete effectively within its market, and recover from the reputational challenges it experienced during its opening period.

75. Defendants' failure to provide adequate digital marketing and brand support is further evidence of a broader pattern in which Defendants failed to provide the support, guidance, and brand stewardship that Plaintiff reasonably expected under the franchise relationship.

## COUNT I - BREACH OF CONTRACT

**(Against All Defendants)**

76. Plaintiff re-alleges and incorporates by reference the allegations set forth in Paragraphs 1 through 75 above as if fully set forth herein.

77. The License Agreement constitutes a valid and binding contract between Plaintiff and Defendant HHF.

78. Defendant IHG, by virtue of its ownership of HHF and control over the franchise system, is an intended third-party beneficiary of the License Agreement.

79. Plaintiff has performed all conditions, covenants, and obligations required of it under the License Agreement, or such performance has been excused or waived.

80. Defendants breached Section 4.B of the License Agreement (Reservation Services) by failing to timely execute Plaintiff's express request to block Kentucky Derby dates, thereby causing reservations to be taken at incorrect low rates, then issuing an affirmative directive requiring Plaintiff to honor those low-rate reservations, and then continuing to refuse Plaintiff access to the reservation service for the Hotel through the weekend of the 2020 Kentucky Derby.

81. Defendants breached Section 3.A of the License Agreement (Standards and Specifications) by assessing QA penalties against Plaintiff for deficiencies in items that Defendants mandated Plaintiff to purchase through approved vendors, where those penalties demonstrably violate express standards as applied.

82. Defendants breached Sections 3.A, 3.B(1)(b), and 3.B(1)(d) of the License Agreement by requiring Plaintiff to use and pay for Defendants' services, but failing to provide those services, in terms of adequate digital marketing, search engine optimization, reputation management, and pre-opening support for the Hotel, including by permitting marketplace confusion through the "Downtown Area"

branding of a non-downtown competitor property, failing to establish basic SEO initiatives at or near the Hotel's opening, and continuing to collect royalty, marketing, technology, and other franchise fees while failing to deliver the brand-level marketing support necessary to properly launch, position, and promote the Hotel. Defendants continued to refuse to provide these services throughout the parties' relationship.

83. As a direct and proximate result of Defendants' breaches, Plaintiff has suffered direct, out-of-pocket damages in an amount to be proven at trial, including but not limited to:

a. Relocation/walk charges invoiced to Plaintiff under Defendants' walk policy, in an amount to be proven at trial;

b. Refunds and chargebacks actually paid to guests, in an amount to be proven at trial;

c. Goodwill credits actually paid to impacted guests, in an amount to be proven at trial;

d. Incremental dispute-handling costs, in an amount to be proven at trial;

e. QA penalties improperly assessed and paid totaling approximately $43,171.71; and

f. Reputational and operational harm in an amount to be proven at trial.

g. Digital marketing, SEO, and pre-opening support costs incurred by Plaintiff as a result of Defendants' failure to provide adequate brand-level marketing support, in an amount to be proven at trial.

## COUNT II - BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

**(Against All Defendants)**

84. Plaintiff re-alleges and incorporates by reference the allegations set forth in Paragraphs 1 through 75 above as if fully set forth herein.

85. Under Georgia law, every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement.

86. Beyond the written terms of the License Agreement, Defendants owed Plaintiff a duty of good faith and fair dealing in relation to their performance under the License Agreement.

87. Defendants breached their duty of good faith and fair dealing by, among other things:

a. Failing to timely implement Plaintiff's blackout request despite acknowledging receipt of the request and the need to implement it, then requiring Plaintiff to honor reservations at incorrect rates caused by Defendants' own delay, and then continuing to refuse

Plaintiff access to the reservation service for the Hotel through the weekend of the 2020 Kentucky Derby;

b. Approving Plaintiff's railing design through multiple reviews over approximately two years, then demanding costly retrofits after construction completion without offering reasonable variance or accommodation, thereby inequitably enforcing standards after repeated approvals and reliance;

c. Mandating vendor purchases at elevated prices while simultaneously penalizing Plaintiff for deficiencies in those vendor-supplied items, demonstrating bad-faith enforcement of QA standards; and

d. Failing to provide adequate digital marketing, SEO, reputation management, and pre-opening support for the Hotel despite collecting marketing, technology, and other franchise fees designated for such purposes, and permitting marketplace confusion through the branding of a non-downtown property as “Downtown Area” to the detriment of the Hotel’s online visibility and search positioning, while requiring Plaintiff to use and pay for such services.

88. As a direct and proximate result of Defendants' breaches of the implied covenant of good faith and fair dealing, Plaintiff has suffered direct, out-of-pocket damages in an amount to be proven at trial.

**COUNT III - DECLARATORY JUDGMENT**

**(Against All Defendants)**

89. Plaintiff re-alleges and incorporates by reference the allegations set forth in Paragraphs 1 through 75 above as if fully set forth herein.

90. An actual controversy exists between Plaintiff and Defendants concerning the parties' respective rights and obligations under the License Agreement. Specifically, Plaintiff seeks a declaration that:

a. Defendants inequitably enforced the Standards by approving Plaintiff's horizontal cable railing design through multiple reviews and site visits over approximately two years, then demanding costly retrofits after construction completion;

b. Defendants are estopped from requiring Plaintiff to retrofit the horizontal cable railings after repeatedly approving the design and permitting Plaintiff to rely on those approvals;

c. Defendants' post-approval demand for railing retrofit violates the implied covenant of good faith and fair dealing; and

d. Plaintiff is entitled to a variance from the horizontal cable railing prohibition, given that the railings are IBC code compliant, extend only to the second level, and were repeatedly approved by Defendants during design and construction.

91. A judicial declaration is necessary and appropriate to determine the parties' rights and obligations and to guide Plaintiff's future conduct with respect to the Hotel.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in its favor and against Defendants and award the following relief:

a. Direct, out-of-pocket compensatory damages in an amount to be proven at trial, including relocation/walk charges, refunds and chargebacks, goodwill credits, incremental dispute-handling costs, QA penalties totaling approximately $43,171.71, digital marketing and SEO-related costs, and reputational and operational damages;

b. A declaratory judgment that Defendants inequitably enforced the Standards by demanding railing retrofits after repeated approvals, that Defendants are estopped from requiring the retrofit, and that Plaintiff is entitled to a variance;

c. Pre-judgment interest on liquidated damages as permitted by Georgia law;

d. Post-judgment interest as provided by law;

e. Costs of suit; and

f. Such other and further relief as this Court deems just and proper.

Dated: June 12, 2026

Respectfully submitted,

MOZLEY, FINLAYSON & LOGGINS LLP

By: */s/ Deborah Shelles Cameron*

DEBORAH SHELLES CAMERON
Georgia Bar No. 105369
dcameron@mfllaw.com

1050 Crown Pointe Parkway
Suite 1500
Atlanta, Georgia 30338
Telephone: 404-256-0700

BLANK ROME LLP

By: */s/ Mark S. Adams*

MARK S. ADAMS
California Bar No. 125485
mark.adams@blankrome.com
JOSEPH J. MELLEMA
California Bar No. 248118
joseph.mellema@blankrome.com

4 Park Plaza
Suite 450
Irvine, California 92614
Telephone: 949-812-6000
Facsimile: 949-812-6001

*Pro hac vice applications to be filed*

Attorneys for Plaintiff